DICKINSON WRIGHT PLLC
Justin J. Bustos
Nevada Bar No. 10320
Email: JBustos@dickinsonwright.com
Brooks T. Westergard
Nevada Bar No. 14300
Email: BWestergard@dickinsonwright.com
100 West Liberty Street, Suite 940
Reno, Nevada 89501-1991
Tel:   775-343-7500
Fax:   844-670-6009

DICKINSON WRIGHT PLLC
Jacob S. Frenkel
MD Bar No. 199206092
(will comply with LR IA 11-2 within 14 days)
Email: JFrenkel@dickinsonwright.com
1825 I St., N.W., Suite 900
Washington, DC 20006
Tel:   202-466-5953
Fax:   844-670-6009

*Attorneys for Plaintiff Upexi, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UPEXI, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>DOES 1-100; ROE CORPORATIONS 1-100; AND XYZ LLCS 1-100,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Upexi, Inc., by and through its counsel of record, the law firm of Dickinson Wright PLLC, submits its Complaint against Does 1 through 100, Roe Corporations 1-100, and XYZ LLCs 1-100, inclusive, and alleges as follows:

**<u>SUMMARY</u>**

During the four-day period from Monday, September 30, 2024, through Wednesday, October 3, 2024, what purported to be approximately 195,000 new stockholders mysteriously

1

appeared each to purchase a single share of the common stock of Upexi, Inc. ("Upexi") in micro-second succession on a national securities exchange to create the appearance of legitimate trading activity, but in fact designed to defraud Upexi out of 202,183 shares of stock. Although the company, on Friday, September 27, 2024 after the close of the market, announced a 20-to-1 reverse stock split, the company had made no announcement that would justify an increase in new stockholders by approximately 4,000 percent. Upon information and belief, to execute this fraudulent scheme, the perpetrator(s) engaged in wash trading and matched orders after positioning the shares into pre-determined accounts to enable effecting the single-share sales to the single-share purchasing accounts. The identities of these accounts, at this time, are known only to the broker-dealers that executed the trades. The purpose of these fraudulent transactions included, *inter alia*, defrauding Upexi into issuing 202,183 shares of stock in connection with the reverse split, concealing the beneficial owners of the trading, and creating the appearance of artificial interest to drive up the ultimate value of individual share positions before dumping the stock into the market.

**PARTIES**

1. Plaintiff, Upexi, Inc., is a Nevada corporation with corporate headquarters located in Las Vegas, Nevada and Tampa, Florida. At all times relevant to this Complaint, Plaintiff had two classes of securities – common stock and a single class of preferred stock convertible into shares of common stock at a ratio of 1.8 shares of preferred stock for a single share of the Company's common stock, with additional terms and conditions determined by the Board of Directors.

2. Defendants each made at least two purchases of Upexi stock in increments of one share in at least two different accounts commencing on or about September 20, 2024, and continuing through and including October 3, 2024.

3. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1-100, Roe Corporations 1-100, and XYZ LLCs 1-100, inclusive, are unknown to Plaintiff, which therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to state the true names and capacities of said fictitious defendants when

they are discovered.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claim arises under section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(a)).

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Nevada.

## GENERAL ALLEGATIONS

6. Plaintiff is engaged in the business of acquiring and operating Amazon and eCommerce brands through 15 active subsidiaries. Plaintiff's established brands are in the health, wellness, pet, beauty and other growing markets. Plaintiff's goal is to continue to accumulate consumer data and build out a significant customer database across all industries into which the company sells, and, in the process, to acquire profitable Amazon and eCommerce businesses that can scale quickly and reduce costs through corporate synergies.

7. At all times relevant to this Complaint, Plaintiff's common stock traded – and continues to trade – on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "UPXI."

8. On June 21, 2023, Nasdaq filed with the Securities and Exchange Commission ("SEC" or "Commission") a proposed rule change, that ultimately became effective on November 1, 2023, related to notification and disclosure of reverse stock splits. That new rule, Nasdaq Listing Rule 5250(e)(7), provides that "[i]n the case of a reverse stock split, a Company must file a complete Company Event Notification Form no later than 12:00 p.m. ET five (5) business days prior to the proposed market effective date….If a Company takes legal action to effect a reverse stock split notwithstanding its failure to timely satisfy these requirements, or provides incomplete or inaccurate information about the timing or ratio of the reverse stock split in its public disclosure, Nasdaq will halt the stock…."

9. Prior to September 27, 2024, Upexi's most recent announcement was on August 8, 2024, titled "Upexi Provides Shareholder Update on Restructuring to Reduce Debt and Increase Working Capital." (https://ir.upexi.com/news-events/press-releases/detail/91/upexi-provides-

3

shareholder-update-on-restructuring-to) (last visited November 21, 2024). Not only did that announcement not impact the market, but the price of Upexi common stock decreased immediately after that announcement.

10. On September 27, 2024, after the close of trading for the week, Plaintiff announced a reverse stock split of its authorized, issued and outstanding shares of common stock and preferred stock at a ratio of 20-to-1 (the "Reverse Split"). Plaintiff published the reverse stock split by filing a Form 8-K. (https://ir.upexi.com/sec-filings/all-sec-filings/content/0001477932-24-005987/0001477932-24-005987.pdf) (last visited November 21, 2024).

11. The purpose of the Reverse Split was to reduce the number of shares and increase the share price in order to regain compliance with Nasdaq requirements for minimum share prices. The Nasdaq Listing Rules generally require that listed companies must maintain a minimum bid price of $1.00; failure to do so for a period of 30 consecutive business days results in a deficiency and could result in a delisting of the company from the Nasdaq. Companies are deemed to have achieved compliance if they are able to raise their bid price to $1.00 or above for a minimum of 10 consecutive business days. Companies often achieve compliance by a reverse stock split.

12. Upexi's announcement of September 27, 2024 stated that, as a result of the Reverse Split, every 20 shares of common stock issued and outstanding would be reclassified into one new share of common stock.

13. On September 27, 2024, Upexi's common stock closed at a pre-split adjusted price on the Nasdaq of $0.21 a share.

14. Upexi scheduled the Reverse Split to become effective at 12:01 a.m. (Eastern Daylight Time) on October 3, 2024, at which time Upexi's common stock would begin trading on a split-adjusted basis.

15. The announcement stated the total number of shares of common stock held by each stockholder of the company would be converted automatically into the number of shares of common stock held by each stockholder immediately prior to the Reverse Split divided by 20, with such resulting number of shares rounded up to the nearest whole share.

16. As a result of the Reverse Split, one share of UPXI stock that an investor had

purchased prior to the reverse split would represent .05 shares of UPXI stock post Reverse Split.

17. The announcement also stated Plaintiff would issue one whole share of the post-reverse stock split common stock to any stockholder who otherwise would have received a fractional share as a result of the reverse stock split. In other words, Upexi would not issue fractional shares in connection with the Reverse Split.

18. The purpose of rounding up fractional shares was to comply with Chapter 78, section 207, of the Nevada Revised Statutes, regarding a change in the number of a company's authorized shares (NRS 78.207).

19. In approving the Reverse Split, Plaintiff relied on the assumption of an efficient market free from manipulation.

20. On the date on which the Reverse Split became effective, the effect of the Reverse Split meant that one share of Upexi post-Reverse Split at this time would be worth $4.20 a share.

21. The Nasdaq provides a definition of an "odd lot" trade as a trading order for less than 100 shares of stock (https://www.nasdaq.com/glossary/o/odd-lot) (last visited November 21, 2024).

22. The daily trade volume for Upexi stock prior to the Reverse Split was a few thousand shares of stock a day. More specifically and relevant to the allegations in this Complaint, in the one week prior to the announcement, specifically between September 23, 2024 and September 27, 2024, there was not one day on which odd lot trading in Upexi totaled more than 5,495 shares.

23. Immediately following Upexi's announcement, for which the first trading day was September 30, 2024, the daily odd lot trading volume on the Nasdaq for Upexi's common stock dramatically increased as follows:

   a. On September 30, 2024, 68,237 odd lots of Upexi shares traded;
   b. On October 1, 2024, 39,738 odd lots of Upexi shares traded;
   c. On October 2, 2024, 29,239 odd lots of Upexi shares traded; and
   d. On October 3, 2024, 68,005 odd lots of Upexi shares traded.

24. For the four-day period of trading of Upexi common stock on the Nasdaq from September 30, 2024 through October 3, 2024, 205,219 shares of Upexi common stock traded in



1  odd lots.

2  25.  Upon information and belief, by virtue of the odd lot trades between September 30, 2024 and October 3, 2024, and specifically by virtue of the odd lot purchases of one single share, Upexi added approximately 195,000 shareholders in four days.

3  26.  On September 27, 2024, upon close of the market, Upexi had fewer that 5,000 shareholders.

4  27.  Upon information and belief, on September 30, 2024, precisely at the open of the market at 9:30:00 A.M., three separate transactions each involving exactly 7,986 shares took place to begin positioning shares to fill the pre-positioned orders for one share of Upexi.

5  28.  Upon information and belief, on October 1, 2024, within 30 minutes of the open of the market at 9:52:14 A.M., one transaction involving exactly 277,112 shares took place to position further shares to fill pre-positioned orders for one share of Upexi.

6  29.  Upon information and belief, the pattern of select transactions to fill the planned single-share odd lot orders occurred throughout September 30, 2024, October 1, 2024, October 2, 2024 and October 3, 2024.

7  30.  Upon information and belief, the odd lot single share purchases of Upexi common stock throughout the period September 30, 2004, through October 3, 2024, were a function of a combination of matched orders and wash trades.

8  31.  Upon information and belief, throughout the period September 30, 2004, through October 3, 2024, Defendants placed manipulative trades in the common stock of Upexi, engineering thousands of coordinated trades between accounts controlled by Defendants acting in concert to create the false impression that market participants were engaging in arms-lengths transactions.

9  32.  Upon information and belief, throughout the period September 30, 2004, through October 3, 2024, Defendants entered pre-arranged orders using various combinations of accounts Defendants controlled to position for sale Upexi common shares they acquired during that period to buy, in turn, single share odd lots of Upexi common shares, with opposite orders submitted at substantially the same time, size, and price with accounts that they alone controlled.

33.   Upon information and belief, this resulted in approximately 195,000 or more instances in which accounts Defendants controlled were on both the buy and sell side of a trade in Upexi common stock throughout the period from September 30, 2004 through October 3, 2024.

34.   Upon information and belief, throughout the period from September 30, 2024 through October 3, 2024, Defendants coordinated these matched orders for no legitimate economic reason. Instead, the purpose of the matched orders was to defraud Upexi out of one whole share of post-split rounded up Upexi common stock and to mislead investors about the extent of the trading activity in the market for Upexi common stock.

35.   Upon information and belief, throughout the period from September 30, 2024 through October 3, 2024, Defendants designed these trades to avert trip-wires, circuit-breakers and other compliance safeguards in place at the broker-dealers at which they executed the trades.

36.   Upon information and belief, the odd lot trades of single share odd lot purchases and related increased trading volume resulted from this market manipulation scheme that the Defendants devised and implemented (the "Round-Up Scheme").

37.   The goal of the Round-Up Scheme was to obtain one whole share of post-split UPXI stock that was worth 20 times the amount of a pre-Reverse Split share.

38.   Upon information and belief, Defendants utilized or created two or more brokerage accounts at the same and at different broker-dealers to make multiple purchases of Upexi common stock in single share odd lot increments.

39.   Upon information and belief, each of these transactions included numerous purchases of a single share of stock (worth 0.05 shares of split-adjusted stock) for the purpose of obtaining one new share of common stock and defrauding Upexi out of shares that it would not otherwise issue had the Defendants effected a single purchase in each of their true names.

40.   Following the Reverse Split, Plaintiff estimates the number of accounts holding Upexi common stock exceeded 200,000.  On information and belief, this increase in the number of accounts holding Upexi common stock resulted from the Round-Up Scheme and Defendants' actions creating numerous accounts holding odd lot shares of pre-Reverse Split stock.

41.   The Round-Up Scheme resulted in Plaintiff being forced to issue 202,183

7

1 additional shares of stock as a result of rounding up fractional shares.

2       42.    Plaintiff did not receive any consideration for being defrauded into issuing these additional shares of Upexi common stock due to the fraudulent actions of Defendants.

      43.    The total number of outstanding shares of Upexi common stock after the Reverse Split and prior to the issuance of the additional round up shares was 1,040,886 shares.

      44.    The Round-Up Scheme caused harm to Plaintiff by fraudulently causing Plaintiff to issue 202,183 shares of stock for a fraction of the value of such stock without Plaintiff receiving consideration in return.

      45.    The Round-Up Scheme also resulted in significant dilution of the value of Upexi common shares, causing harm to Upexi and its pre-announcement shareholders.

      46.    Upon information and belief, the Round-Up Scheme deceived Upexi investors regarding the actual supply and demand for Upexi common stock.

      47.    The increased trading volume caused by the Round-Up Scheme created the false impression that numerous market participants were purchasing Upexi common stock. In reality, Plaintiff is informed and believes that Defendants created this false impression by engaging in numerous transactions by using multiple different accounts without there being a change in the underlying beneficial ownership of the Upexi common shares.

      48.    Upon information and belief, the Defendants implemented the same manipulative scheme involving securities of other issuers with various classes of stock also traded on the Nasdaq and executed the scheme at the same broker-dealers.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934**
**(MARKET MANIPULATION)**

      49.    Plaintiff reasserts and realleges all allegations in the foregoing paragraphs as if fully restated herein.

      50.    In violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce or of the mails, did knowingly, intentionally, and/or recklessly use or employ, in connection with the purchase or sale of securities, a manipulative or deceptive device or



contrivance in violation of SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), by: (a) employing devices, schemes, and artifices to defraud; and/or (b) engaging in acts, practices, or courses of business that operated and would operate as a fraud and deceit against Plaintiff and Plaintiff's shareholders of record on September 27, 2024.

51. Defendants engaged in manipulative acts, including wash trading, matched orders and pre-arranged trades, consisting of utilizing multiple brokerage accounts to purchase single share odd lots of Upexi common stock in each account in order to defraud Plaintiff into issuing additional shares of stock to Defendants.

52. Defendants' actions were fraudulent and intended to make it appear as if multiple independent purchasers were purchasing shares of Upexi common stock. Defendants did this to deceive Plaintiff into issuing Defendants additional shares of Upexi common stock. These purchases also conveyed false information to the market concerning the real purpose of the purchases.

53. Defendants' actions of making multiple small purchases over multiple accounts artificially impacted market activity.

54. Defendants intended for these actions to, and Defendants did, earn a substantial profit by defrauding Plaintiff into issuing one whole share of stock for each pre-split odd lot transaction made by each of the Defendants.

55. Defendants have damaged Plaintiff by causing Plaintiff to issue 202,183 additional shares of Upexi common stock as a result of Upexi rounding up fractional shares.

56. Plaintiff effected the Reverse Split for a bona fide market purpose, specifically to come into compliance with Nasdaq's minimum price rule, with the reasonable expectation of an efficient market free of manipulation, to wit, Plaintiff would issue round-up shares of stock to legitimate Upexi stockholders who held a fractional share of stock and not to market manipulators who intentionally purchased fractional shares over multiple accounts.

57. Defendants' actions of creating multiple accounts to make purchases of limited odd lot quantities of Upexi common stock in each account in order to force Plaintiff to issue additional shares of post-Reverse Split stock evidences fraudulent intent and a motive and opportunity to

defraud Upexi using the facilities of a national stock exchange.

58. Plaintiff was the seller of Upexi common stock – securities – by virtue of Plaintiff's issuance of 202,183 shares of Upexi common stock arising out of Defendants' fraudulent conduct.

59. Plaintiff has suffered damages.

60. Plaintiff has been forced to retain counsel to prosecute this action and is entitled to an award of attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

61. Plaintiff reasserts and realleges all allegations in the foregoing paragraphs as if fully restated herein.

62. There is a present controversy between and among the parties hereto as to the duties, rights, and obligations of the parties, specifically as to whether Plaintiff is obligated to issue shares of Upexi common stock to the purported odd lot purchasers on September 30, 2024, October 1, 2024, October 2, 2024 and October 3, 2024, and which controversy has impacted Plaintiff adversely, and which, if not resolved, will result in further injury.

63. This court has jurisdiction to enter a declaratory judgment declaring the extent and nature of the duties and obligations of Plaintiff with respect to whether Plaintiff shall be required to issue shares of Upexi common stock to the purported odd lot purchasers on September 30, 2024, October 1, 2024, October 2, 2024 and October 3, 2024. A Declaration by this Court of the rights of Plaintiff with respect to the matters raised in this Complaint is necessary to put an end to the continuing conduct of Defendants, and their agents, employees, and broker-dealers which is intended and/or has the effect of adversely impacting the interests of Plaintiff as alleged herein and causing harm to the interest of all shareholders of record of Upexi common stock as of September 30, 2024.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays against Defendants, and each of them, as follows:

A. For compensatory damages in an amount to be determined at trial;

B. For prejudgment interest and post-judgment interest;



C. For declaratory judgment;

D. For costs incurred in this action;

E. For reasonable attorneys' fees;

F. For such other and further relief as the Court may deem just and proper.

DATED this 22nd day of November, 2024.

                                                    DICKINSON WRIGHT PLLC

                                                    */s/ Justin J. Bustos*
Justin J. Bustos (Nevada Bar No. 10320)
Email: JBustos@dickinsonwright.com
Brooks T. Westergard (Nevada Bar No. 14300)
Email: BWestergard@dickinsonwright.com
100 West Liberty Street, Suite 940
Reno, Nevada 89501-1991
Tel:    775-343-7500

Jacob S. Frenkel
MD Bar No. 199206092
(will comply with LR IA 11-2 within 14 days)
Email: JFrenkel@dickinsonwright.com
1825 I St., N.W., Suite 900
Washington, DC 20006
Tel:    202-466-5953

*Attorneys for Plaintiff Upexi, Inc.*

4878-2878-0798 v1 [100775-25]