1  DICKINSON WRIGHT PLLC
   Justin J. Bustos
2  Nevada Bar No. 10320
   Email:  JBustos@dickinsonwright.com
3  Brooks T. Westergard
   Nevada Bar No. 14300
4  Email:  BWestergard@dickinsonwright.com
   100 West Liberty Street, Suite 940
5  Reno, Nevada 89501-1991
   Tel:     775-343-7500
6  Fax:     844-670-6009

7  DICKINSON WRIGHT PLLC
   Jacob S. Frenkel
8  MD Bar No. 199206092
   (will comply with LR IA 11-2 within 14 days)
9  Email: JFrenkel@dickinsonwright.com
   1825 I St., N.W., Suite 900
10 Washington, DC 20006
   Tel:     202-466-5953
11 Fax:     844-670-6009

12 *Attorneys for Plaintiff Upexi, Inc.*

13

14                    **UNITED STATES DISTRICT COURT**
15                         **DISTRICT OF NEVADA**

16
   UPEXI, INC., a Nevada corporation,
17                                                Case No.: 2:24-cv-02185-JCM-MDC
                          Plaintiff,
18                                                **PLAINTIFF'S EX PARTE MOTION TO**
   v.                                             **CONDUCT LIMITED EXPEDITED**
19                                                **DISCOVERY TO DETERMINE THE**
   DOES 1-100; ROE CORPORATIONS 1-100;            **IDENTITY OF UNKNOWN**
20 AND XYZ LLCS 1-100,                            **DEFENDANTS**

21                        Defendant.

22

23        Plaintiff Upexi, Inc. ("Plaintiff" or "Upexi"), by and through its counsel of record, the law

24 firm of Dickinson Wright PLLC, hereby moves for an order allowing it to conduct limited

25 expedited discovery to determine the identity of the unknown Doe and Roe defendants. This

26 Motion is based on the following Memorandum of Points and Authorities, the Declaration of

27 Andrew Norstrud, and all papers and pleadings on file herein.

28

In accordance with LR IA 7-2, Plaintiff is seeking *ex parte* relief because the only defendants in this action have been fictitiously named, and service on such fictitiously-named defendants is impossible at this juncture. Discovery to determine the identity of fictitiously-named defendants is authorized in the Ninth Circuit in appropriate circumstances such as those presented in this case. *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The Court should allow Upexi to conduct limited expedited discovery to determine the identity or identities of the defendants in this case. The Complaint alleges that unknown Defendants participated in a stock market manipulation scheme designed to defraud Upexi into issuing 202,183 shares of its common stock without consideration. However, given that the parties participating in the fraud scheme held their securities in "street name," a common practice for national securities exchanges, Upexi does not know the actual identifies of the person or persons who committed the fraud. Further, Upexi does not have specific information on the exact trading at issue due to the fact that shares of stock would only be present at the effective date and time of the transactions at issue in this case. As such, Upexi seeks leave to serve narrow third-party subpoenas on the brokers used to make the manipulative stock trades. Once the identities of defendants are determined, the actual defendants can be substituted in place of the fictitious defendants and the case can proceed in the ordinary course.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Upexi is a Nevada corporation engaged in the business of acquiring and operating Amazon and eCommerce brands through multiple active subsidiaries. (Compl. ¶ 6, ECF No. 6.) Upexi's established brands are in the health, wellness, pet, beauty and other growing markets. *Id*. At all relevant times, Upexi's common stock traded on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "UPXI." *Id*. ¶ 7.

**A.**    <u>The Reverse Stock Split</u>

On September 27, 2024, after the close of trading for the week, Plaintiff announced a reverse stock split of its authorized, issued and outstanding shares of common stock and preferred stock at a ratio of 20-to-1 (the "Reverse Split"). *Id*. ¶ 10.  The purpose of the Reverse Split was to reduce the number of shares and increase the share price in order to regain compliance with Nasdaq requirements for minimum share prices. *Id*. ¶ 11.[1]

Upexi's announcement stated that, as a result of the Reverse Split, every 20 shares of common stock issued and outstanding would be reclassified into one new share of common stock. *Id*. ¶ 12. On September 27, 2024, Upexi's common stock closed at a pre-split adjusted price on the Nasdaq of $0.21 a share. *Id*. ¶ 13. Upexi scheduled the Reverse Split to become effective at 12:01 a.m. (Eastern Daylight Time) on October 3, 2024, at which time Upexi's common stock would begin trading on a split-adjusted basis. *Id*. ¶ 14.

The announcement stated the total number of shares of common stock held by each stockholder of the company would be converted automatically into the number of shares of common stock held by each stockholder immediately prior to the Reverse Split divided by 20, with such resulting number of shares rounded up to the nearest whole share.  *Id*. ¶ 15. As a result of the Reverse Split, one share of UPXI stock that an investor had purchased prior to the reverse split would represent .05 shares of UPXI stock post Reverse Split. *Id*. ¶ 16.

The announcement also stated Plaintiff would issue one whole share of the post-reverse stock split common stock to any stockholder who otherwise would have received a fractional share as a result of the reverse stock split. *Id*. ¶ 17. In other words, Upexi would not issue fractional shares in connection with the Reverse Split. *Id.* The purpose of rounding up fractional shares was to comply with NRS 78.207 regarding a change in the number of a company's authorized shares. *Id*. ¶ 18.

---

[1] The Nasdaq Listing Rules generally require that listed companies must maintain a minimum bid price of $1.00; failure to do so for a period of 30 consecutive business days results in a deficiency and could result in a delisting of the company from the Nasdaq. Companies are deemed to have achieved compliance if they are able to raise their bid price to $1.00 or above for a minimum of 10 consecutive business days. Companies often achieve compliance by a reverse stock split. (Compl. ¶ 11, ECF No. 1.)

On the date on which the Reverse Split became effective, the effect of the Reverse Split meant that one share of Upexi post-Reverse Split at this time would be worth $4.20 a share. *Id*. ¶ 20. The daily trade volume for Upexi stock prior to the Reverse Split was a few thousand shares of stock a day. *Id*. ¶ 22. More specifically and relevant to the allegations in this Complaint, in the one week prior to the announcement, between September 23, 2024 and September 27, 2024, there was not one day on which odd lot[2] trading in Upexi totaled more than 5,495 shares. *Id*. ¶ 22.

Immediately following Upexi's announcement, for which the first trading day was September 30, 2024, the daily odd lot trading volume on the Nasdaq for Upexi's common stock dramatically increased as follows:

        a.  On September 30, 2024, 68,237 odd lots of Upexi shares traded;

        b.  On October 1, 2024, 39,738 odd lots of Upexi shares traded;

        c.  On October 2, 2024, 29,239 odd lots of Upexi shares traded; and

        d.  On October 3, 2024, 68,005 odd lots of Upexi shares traded.

*Id*. ¶ 23. For the four-day period of trading of Upexi common stock on the Nasdaq from September 30, 2024 through October 3, 2024, 205,219 shares of Upexi common stock traded in odd lots. *Id*. ¶ 24.

Upexi's Complaint alleges, upon information and belief, that by virtue of the odd lot trades between September 30, 2024 and October 3, 2024, and specifically by virtue of the odd lot purchases of one single share, Upexi added approximately 195,000 shareholders in four days. *Id*. ¶ 25. In contrast, on September 27, 2024, Upexi had fewer than 5,000 shareholders upon close of the market. *Id*. ¶ 26.

The total number of outstanding shares of Upexi common stock after the Reverse Split and prior to the issuance of the additional round up shares was 1,040,886 shares. *Id*. ¶ 43. Following the Reverse Split, Upexi has either issued or is being asked to issue 202,183 shares of additional stock as a result of rounding up fractional shares. *See id*. ¶ 41.

---

[2] The Nasdaq provides a definition of an "odd lot" trade as a trading order for less than 100 shares of stock. (https://www.nasdaq.com/glossary/o/odd-lot) (last visited January 7, 2025).

**B.**    <u>The Round-Up Scheme</u>

Upexi's Complaint alleges that the dramatic increase of trading activity and appearance of new stockholders was part of a stock manipulation scheme (the "Round-Up Scheme") designed to defraud the company out of 202,183 shares of stock. *See generally* (Compl.) Specifically, during the four-day period from Monday, September 30, 2024, through Wednesday, October 3, 2024, approximately 195,000 new stockholders mysteriously appeared each to purchase a single share of Upexi common stock in microsecond succession on a national securities exchange to create the appearance of legitimate trading activity, but were in fact designed to defraud Upexi into issuing additional shares of stock as a result of the Reverse Split. *Id*. at 1-2.

Based on Upexi's investigation, it believes that on September 30, 2024, precisely at the open of the market at 9:30:00 A.M., three separate transactions each involving exactly 7,986 shares took place to begin positioning shares to fill pre-positioned orders for one share of Upexi. *Id*. ¶ 27. On October 1, 2024, within 30 minutes of the open of the market at 9:52:14 A.M., one transaction involving exactly 277,112 shares took place to position further shares to fill pre-positioned orders for one share of Upexi. *Id*. ¶ 28. The pattern of select transactions to fill the planned single-share odd lot orders occurred throughout September 30, 2024, October 1, 2024, October 2, 2024 and October 3, 2024. *Id*. ¶ 29. Plaintiff believes the odd lot single share purchases of Upexi common stock during this period were a function of a combination of matched orders and wash trades. *Id*. ¶ 30.

Upon information and belief, throughout the period September 30, 2004, through October 3, 2024, Defendants placed manipulative trades in the common stock of Upexi, engineering thousands of coordinated trades between accounts controlled by Defendants acting in concert to create the false impression that market participants were engaging in arms-lengths transactions. *Id*. ¶ 31. Upexi believes that Defendants utilized or created two or more brokerage accounts at the same and at different broker-dealers to make multiple purchases of Upexi common stock in single share odd lot increments. *Id*. ¶ 38.

Plaintiff believes Defendants entered pre-arranged orders using various combinations of accounts Defendants controlled to position for sale Upexi common shares they acquired during

that period to buy, in turn, single share odd lots of Upexi common shares, with opposite orders submitted at substantially the same time, size, and price with accounts that they alone controlled. *Id*. ¶ 32. This resulted in approximately 195,000 or more instances in which accounts Defendants controlled were on both the buy and sell side of a trade in Upexi common stock throughout the period from September 30, 2004 through October 3, 2024. *Id*. ¶ 33. Each coordinated matched order was made for the purpose of defrauding Upexi out of one whole share of post-split rounded up Upexi common stock and to mislead investors about the extent of trading activity in the market for Upexi common stock that was worth 20 times the amount of a pre-Reverse Split share. *Id*. ¶¶ 34, 37, 39.

As a result of the Round-Up Scheme, Upexi's transfer agent[3] has indicated the total number of shares to be issued as a result of rounding up fractional shares is 202,183. *Id*. ¶ 41; (Norstrud Decl. ¶ 5, **Exhibit 1**); (Beneficial Holders List, **Exhibit 2**.) Upexi's transfer agent has indicated that the broker-dealers claiming the largest number of round-up shares are as follows: (1) Apex Clearing Corp. (90,867 shares); (2) NFS (54,882 shares); (3) Charles Schwab (22,983 shares); (4) Robinhood Securities (19,313 shares); (5) Bear Stearns (12,014 shares); (6) Pershing LLC (888 shares); (7) Morgan Stanley (661 shares); and (8) Phillip Capital (251 shares). (Norstrud Decl. ¶ 5, **Exhibit 1**); (Beneficial Holders List, **Exhibit 2**.). Upexi does not know the identity of the account holders. (Norstrud Decl. ¶ 3, **Exhibit 1**.) Instead, only the broker-dealers that executed the trades know the identities of the accounts at issue. *Id*.; (Compl. at Summary, ECF No. 1.)

**C.    The Complaint**

Upexi filed its Complaint in this action on November 22, 2024. The Complaint alleges two claims for relief: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934; and (2) Declaratory Relief. However, Upexi does not know the identity of the defendant or defendants participating in the Round-Up Scheme. (Compl. at Summary, ECF No. 1.) For that reasons, the defendant or defendants have been fictitiously named and Upexi now seeks to conduct limited discovery to identify the fictitiously-named defendants.

---

[3] A stock transfer agent is an institution assigned by a corporation to record transactions, cancel and issues certificates, processes investor mailings, and make any distributions to shareholders.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 26(d) provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except. . . when authorized by these rules, by stipulation, or by court order." The Court may authorize expedited discovery before the Rule 26(f) conference upon a showing of good cause. *First Option Mortg., LLC v. Tabbert*, No. 2:12-CV-00600-KJD, 2012 WL 1669430, at *1 (D. Nev. May 11, 2012) (citing *American LegalNet, Inc. v. Davis,* 673 F. Supp .2d 1063, 1066 (C.D.Cal. 2009)). "Good cause exists 'where the need for expedited discovery, in consideration for the administration of justice, outweighs the prejudice to the responding party." *Id.*

### IV.    ARGUMENT

The Ninth Circuit recognizes that "where the identity of alleged defendants will not be known prior to the filing of a complaint. . . , the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (citing *Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir.1978)); *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999). Courts evaluate the following factors in determining whether to allow expedited discovery to determine the identify of a defendant:

> Whether: (1) the plaintiff can identify the missing party with sufficient specificity such that the court can determine that the defendant is a real person or entity who could be sued in federal court; (2) the plaintiff has identified all previous steps taken to locate the elusive defendant; (3) the plaintiff's suit against the missing defendant could withstand a motion to dismiss; and (4) the plaintiff has demonstrated a reasonable likelihood of being able to identify the defendant through discovery such that service of process would be possible.

*Liberty Media Holdings, LLC v. Letyagin*, No. 2:12-CV-00923-LRH, 2012 WL 3135671, at *3 (D. Nev. Aug. 1, 2012) (citing In *Hard Drive Productions v. Does 1–90,* 2012 WL 1094653, *1 (N.D. Cal. 2012)).

### A.    Plaintiff Has Identified the Doe and Roe Defendants with Sufficient Specificity

The Complaint identifies the defendants as those who "each made at least two purchases of Upexi stock in increments of one share in at least two different accounts commencing on or

1    about September 20, 20204, and continuing through and including October 3, 2024." (Compl. ¶ 2,

2    ECF No. 1.) This definition is sufficiently specific that it allows for the precise identification of

3    defendants who participate in the alleged manipulative stock scheme. The definition applies only

4    to individuals and entities who made a least two trades of Upexi stock in increments of one share

5    each over a four-day period. Given that the stock price of Upexi was around $0.21 a share at the

6    time, there is no legitimate explanation for making multiple one share trades in multiple accounts

7    other than to pursue the Round-Up scheme alleged in the Complaint. *See* (Compl. ¶ 13, 34, ECF

8    No. 1.) These objective criteria serve to define exactly who and who is not a defendant in this case.

9    This factor favors allowing expedited discovery to identify the unknown defendants.

10   **B.** **Plaintiff Has Recounted the Steps It Has Taken to Locate and Identify the Defendants**

11           Plaintiff has taken all reasonable measures to identify the Doe and Roe defendants.

12   However, it is unable to determine the identity of the Defendants because shareholders of publicly

13   traded securities, such as Upexi's common stock, frequently hold their securities in "street name."

14   As the Nevada Supreme Court has explained:

15
16           The term "street name" refers to a "brokerage firm's name in which securities
             owned by another are registered." Black's Law Dictionary 1557 (9th ed. 2009). A
17           beneficial holder of stock holds equitable title to corporate stock; however, the
             stock is not registered under the holder's name in the corporation's records. *Id*. at
18           176. Thus, in practice, the beneficial holder of stock holds equitable title to the
             stock that is registered under the holder in street name.

19

20   *Smith v. Kisorin USA, Inc.*, 127 Nev. 444, n.1, 254 P.3d 636, n.1 (2011).

21           Here, after the Reverse Split, Upexi sought information from V Stock Transfer, its transfer

22   agent, regarding the accounts requesting additional round-up shares of stock. (Norstrud Decl. ¶ 4,

23   **Exhibit 1**.) V Stock Transfer does not have information regarding the beneficial holders of stock.

24   *Id*. Instead, it has information regarding bulk trade from the Depository Trust & Clearing

25   Corporation ("DTC"). *Id*. V Stock Transfer provided a list that shows all of the broker-dealers

26   requesting round-up shares. *Id*. ¶ 5; (Beneficial Holders List, **Exhibit 2**.) In light of the common

27   practice of holding securities in street name, neither Plaintiff nor its transfer agent has any ability

28   to determine the beneficial holder of such shares. *Id*. ¶ 6. Such information is only known to the

DICKINSON WRIGHT
ATTORNEYS AT LAW

1  broker-dealers that were used to make the trades at issue in this case. *Id*. ¶ 6; (Compl. at Summary,

2  ECF No. 1.)

3  **C.    Plaintiff's Complaint Can Withstand a Motion to Dismiss**

4          Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is only proper where a pleader fails to state

5  a claim upon which relief can be granted. A pleading must give fair notice of a legally cognizable

6  claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

7  Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007). To survive a motion to dismiss, "a complaint must

8  contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

9  face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)

10  (citing *Twombly*, 550 U.S. at 570)

11          Upexi's cause of action in this case is brought under Section 10(b) of the Securities

12  Exchange Act of 1934. To state a claim under Section 10(b), a plaintiff must plead the following

13  elements: (1) use or employment of any manipulative or deceptive device or contrivance; (2)

14  scienter, *i.e.* wrongful state of mind; (3) a connection with the purchase or sale of a security; (4)

15  reliance, often referred to ... as "transaction causation;" (5) economic loss; and (6) loss causation,

16  *i.e.* a causal connection between the manipulative or deceptive device or contrivance and the loss.

17  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). "A claim for market

18  manipulation is subject to Rule 9(b)'s heightened pleading standards, but, because it 'can involve

19  facts solely within the defendant's knowledge ... at the early stages of litigation, the plaintiff need

20  not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *In*

21  *re Bank of Am. Corp.*, No. 09-MD-02014 JSW, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011)

22  (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).

23          In this case, Upexi's Complaint would survive a motion to dismiss. The Complaint

24  describes the manipulative Round-Up Scheme in great detail. It describes the specific nature of the

25  Round-Up Scheme, the parties involved, and the specific dates the manipulative conduct occurred.

26  *See generally* (Compl., ECF No. 1.) The manipulative market transactions took place on the

27  Nasdaq, were made for the purposes of defrauding Upexi out of common stock, and could not have

28  served any legitimate market purpose. *Id*. at Summary and ¶¶ 7, 13, 34, 48. The Complaint further

alleges that Upexi was the seller of its common stock by virtue of the issuance of 202,183 shares result from Defendant's fraudulent conduct. *Id*. ¶ 58; *see also Ruckle v. Roto Am. Corp.*, 339 F.2d 24, 27 (2d Cir. 1964) ("As a matter of authority and principle, the issuance by a corporation of its own shares is a 'sale' to which the anti-fraud policy expressed in the federal securities laws extends."). Finally, Upexi was damaged by the Round-Up Scheme in that it is being asked to issue 202,183 shares of stock without receiving any consideration and which results in significant dilution to existing shareholders. (Compl. ¶¶ 44-45, 59.)

Based on the foregoing, Upexis had pled each elements of its claim with particularity such that it could withstand a motion to dismiss.

**D.**    **Discovery Is Likely to Lead to Identifying Information That Will Permit Service of Process**

Finally, the discovery Upexi seeks is likely to result in identifying information that will permit it to seek to amend the Complaint under Rule 15 to identify the actual defendants and allow service of process. Specifically, Plaintiff seeks leave to serve subpoenas on the eight broker-dealers seeking the largest number of round up shares. These brokers are: (1) Apex Clearing Corp. (90,867 round-up shares); (2) National Financial Services LLC ("NFS") (54,882 round-up shares); (3) Charles Schwab (22,983 round-up shares); (4) Robinhood Securities (19,313 round-up shares); (5) Bear Stearns (12,014 round-up shares); (6) Pershing LLC (888 round-up shares); (7) Morgan Stanley (661 round-up shares); and (8) Phillip Capital (251 round-up shares). The requested subpoenas will be limited to seeking the identity and contact information of all beneficial account holders that made one-share transactions of Upexi common stock between September 30, 2024 and October 3, 2024.  Defendants will then compare the account holders provided in response to the subpoenas to identify the individuals and entities that made at least two transactions of one share each in two or more separate accounts. Further, the subpoenas will provide minimal burden on third parties given that they will only be required to search for transaction made over a four-day period on a single security. Thus, the information requested is narrowly tailored, is likely to result in identifying the individuals and entities participating in the Round-Up Scheme, and will result in minimal burden.

1

### IV.    CONCLUSION

2      Based on the foregoing, Upexi respectfully requests that the Court grant this Ex Parte

3  Motion and allow it to serve narrow third-party subpoenas to identify the unknown defendants

4  participating in the Round-Up Scheme.

5      DATED this 7th day of January, 2025.

6                                        DICKINSON WRIGHT PLLC

7

8                                        */s/ Justin J. Bustos*
                                         Justin J. Bustos (Nevada Bar No. 10320)
9                                        Email:  JBustos@dickinsonwright.com
                                         Brooks T. Westergard (Nevada Bar No. 14300)
10                                       Email:  BWestergard@dickinsonwright.com
                                         100 West Liberty Street, Suite 940
11                                       Reno, Nevada  89501-1991
                                         Tel:     775-343-7500
12
                                         DICKINSON WRIGHT PLLC
13                                       Jacob S. Frenkel
                                         MD Bar No. 199206092
14                                       (will comply with LR IA 11-2 within 14 days)
                                         Email:  JFrenkel@dickinsonwright.com
15                                       1825 I St., N.W., Suite 900
                                         Washington, DC  20006
16                                       Tel:     202-466-5953
                                         *Attorneys for Plaintiff Upexi, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28



11

1

**EXHIBIT TABLE**

| Exhibit | Description | Pages[4] |
|---|---|---|
| 1 | Declaration of Andrew Norstrud in Support of Ex Parte Motion Leave to Conduct Limited Expedited Discovery | 2 |
| 2 | Beneficial Holders List | 2 |

4910-4450-0482 v2 [100775-25]

---

[4] Exhibit Page counts are exclusive of exhibit slip sheets.